MARTIN A. MUCKLEROY
**MUCKLEROY LUNT, LLC**
Nevada Bar No.: 009634
6077 S. Fort Apache Rd., Ste. 140
Las Vegas, NV 89148
Tel: (702) 907-0097
Fax: (702) 938-4065
martin@muckleroylunt.com

(Additional Counsel on Signature Page)

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| MO JEEWA, Derivatively on Behalf of PAYSIGN, INC., | Case No. _____ |
| Plaintiff, | |
| v. | **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** |
| MARK R. NEWCOMER, MARK ATTINGER, DANIEL H. SPENCE, JOAN M. HERMAN, DAN R. HENRY, BRUCE A. MINA, DENNIS TRIPLETT, and QUINN WILLIAMS, | **JURY TRIAL DEMANDED** |
| Defendants, | |
| -and- | |
| PAYSIGN, INC., | |
| Nominal Defendant. | |

Plaintiff Mo Jeewa ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Paysign, Inc. ("Paysign" or the "Company"), with the U.S. Securities and Exchange Commission (the "SEC"); (b) review of pleadings filed in a federal securities class action against

Paysign and many of the defendants named herein, captioned at *In re Paysign, Inc. Securities Litigation*, No. 20-cv-00553-GMN-DJ (D. Nev.) (the "Securities Class Action"); (c) review and analysis of press releases and media reports issued by and disseminated by Paysign; (d) review of other publicly available information concerning Paysign; and (e) direct communications between Plaintiff's counsel and the Company or its board of directors (the "Board").

<u>**NATURE AND SUMMARY OF THE ACTION**</u>

1.      Whether to commence litigation on a corporation's behalf is normally left to the discretion of its board of directors, who are legally bound to carry out their fiduciary duties in the best interests of the corporation and its shareholders. Thus, absent exceptional circumstances, shareholders seeking to vindicate a corporation's interests must make a pre-suit demand on the board to investigate potential wrongdoing and, where appropriate, bring litigation. But the board's prerogative is not absolute. When the board shirks its duty to investigate and defend the corporation's interest, shareholders may nevertheless step into the corporation's shoes and commence litigation on its behalf. That's what has happened here.

2.      Paysign is a Nevada corporation that prepaid card programs and processing services for corporate, consumer and governmental applications. It was founded in 2001 by Mark R. Newcomer ("Newcomer") and Daniel H. Spence ("Spence").

3.      Paysign has a long history of lax accounting controls, including employing an accountant, Arthur De Joya ("Joya") that was prohibited from practicing as an accountant pursuant to an SEC cease and desist order in 2015. Joya was suspended from practicing or appearing before the SEC because he ignored the signs of an elaborate fraud associated with the audit of another company, which the SEC found amounted to no real audit. Not only did Joya serve as the Company's CFO between 2007 and 2015, but his company was hired as an independent auditor for Paysign.

4.      On March 16, 2020, Paysign announced a delay in filing its annual report for 2019, citing a material weakness in its internal controls over financial reporting and information technology general controls. In April 2020, Paysign disclosed that material weaknesses in the Company's internal controls over financial reporting existed as of December 31, 2019, including

"lack[ing] sufficient monitoring and disclosure controls to prevent and terminate the employment of an individual barred from practicing before the Securities and Exchange Commission who assisted the Company in accounting matters related to the preparation of its financial statements for 2017, 2018, and 2019."

5.      Paysign's stock price plummeted in the wake of the revelations, but the harm extended beyond its investors. Indeed, the Company itself became the target of securities fraud litigation brought by aggrieved investors (*i.e.*, the Securities Class Action), who alleged claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). On February 9, 2023, United States District Judge Gloria M. Navarro granted in part and denied in part the defendants' motion to dismiss the Securities Class Action. Specifically, Judge Navarro sustained the Section 10(b) claims against Paysign, Newcomer, and Attinger.

6.      In light of the harm inflicted on Paysign by Newcomer and Attinger—as well as the rest of the Board members who stood by idly while the Company falsely assured investors of the adequacy of its internal controls despite employing a known fraudster—Plaintiff sent a letter on May 28, 2021 demanding that the Board take immediate remedial action (the "Demand"). The Company responded by letter dated June 10, 2021, advising that the Board "would consider" the demand.

7.      But the Board did not consider Plaintiff's Demand.

8.      Plaintiff followed up with the Company and the Board on numerous occasions—on May 16, 2022, June 9, 2022, July 5, 2022, April 17, 2023, and June 21, 2023—each time requesting information about what (if anything) the Board was doing to investigate and prosecute the matters raised in the Demand. At every turn, without *any* apparent Board consideration or determination, the Company rebuffed the idea that anything needed to be done, or that anything needed to be done to rectify the serious missteps that resulted in the Company's woefully inadequate internal controls and the resulting Securities Class Action. Such obstruction and willful neglect of the pressing, meritorious issues raised in Plaintiff's Demand is tantamount to a wrongful refusal.

9.      Plaintiffs' Demand set forth a credible case that Paysign's officers and directors had breached their fiduciary duties to the Company. And by refusing to consider, investigate, and take

action in response to Plaintiff's Demand, the Board's constructive refusal represents an independent breach of fiduciary duty.

10.     Plaintiff is, therefore, forced to bring this "demand refused" shareholder derivative action on Paysign's behalf.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over all claims under 28 U.S.C. § 1332(a) because there is complete diversity between the parties and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

12.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

13.     This Court has personal jurisdiction over each defendant because each defendant is either a corporation conducting business and maintaining operations in this district or an individual who is either present in this district for jurisdictional purposes or has, directly and indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities markets, such that each defendant has sufficient minimum contacts with this district so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

14.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because: (i) nominal defendant Paysign maintains its principal place of business in this district; (ii) one or more of the Defendants resides or maintains offices in this district; (iii) a substantial portion of the transactions and wrongs complained of herein occurred in this district; and (iv) Defendants have received substantial compensation in this district by doing business here and engaging in numerous activities that had an effect in this district.

## THE PARTIES

15.     Plaintiff Mo Jeewa, a citizen of Canada,  is a current Paysign stockholder and has continuously been a Paysign stockholder at all relevant times.

16.     Nominal Defendant Paysign is a Nevada corporation with its principal executive offices located at 2615 St. Rose Parkway, Henderson, Nevada 89012. From 2006 through April 23, 2019, Paysign was known as 3PEA. The Company's securities trade on the Nasdaq Capital Market ("NASDAQ") under the ticker symbol "PAYS."

17.     Defendant Newcomer is a cofounder of the Company and has served as the Company's CEO since March 2006. Newcomer also serves as Chairman of the Board. For fiscal year 2019, Newcomer received $1,031,969 in compensation from the Company. Upon information and belief Newcomer is a citizen of Nevada.

18.     Mark Attinger ("Attinger") served as the Company's Chief Financial Officer ("CFO") between December 2018 and February 2021. For fiscal year 2019, Attinger received $647,088 in compensation from the Company. Upon information and belief, Attinger is a citizen of Arizona.

19.     Defendant Spence, a cofounder of the Company, served as a director of the Board between March 2006 and August 2022. Also, defendant Spence served as the Company's Chief Technology Officer ("CTO") between March 2006 until December 2020. For fiscal year 2019, Spence received $663,036 in compensation from the Company. Upon information and belief, Spence is a citizen of Australia.

20.     Defendant Joan M. Herman ("Herman") has served as the Company's Executive Vice President, Operations and as a director of the Board since November 2018. Upon information and belief, Herman is a citizen of Nevada.

21.     Defendant Dan R. Henry ("Henry") has served as a director of the Board since May 2018. For fiscal year 2019, defendant Henry received $413,568 in compensation from the Company. Upon information and belief, defendant Henry is a citizen of Texas. During the Relevant Period, Henry served on the Board's Audit Committee, Compensation Committee, and Nominating Committee.

22.     Defendant Bruce A. Mina has served as a director of the Board since March 2018. For fiscal year 2019, defendant Mina received $79,456 in compensation from the Company. Upon

information and belief, defendant Mina is a citizen of New York. During the Relevant Period, Mina served on the Board's Audit Committee and Compensation Committee.

23.    Defendant Dennis Triplett ("Triplett") has served as a director of the Board since May 2018. For fiscal year 2019, Triplett received $87,817 in compensation from the Company. Upon information and belief, Triplett is a citizen of Missouri. During the Relevant Period, Triplett served on the Board's Audit Committee and Compensation Committee.

24.    Defendant Quinn Williams ("Williams") served as a director of the Board between April 2018 and December 2022. For fiscal year 2019, Williams received $100,891 in compensation from the Company.  Upon information and belief, Williams is a citizen of Arizona. During the Relevant Period, Williams served on the Board's Compensation Committee and Nominating Committee.

25.    Defendants Newcomer, Attinger, Spence, Herman, Henry, Mina, Triplett, and Williams are collectively referred to as "Individual Defendants."

**DUTIES OF THE DEFENDANTS**

26.    By reason of their positions as officers or directors of the Company and because of their ability to control the business and corporate affairs of the Company, Defendants owed the Company and its stockholders the fiduciary obligations of good faith, loyalty, and candor and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

27.    Defendants, because of their positions of control and authority as directors or officers of the Company, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

28.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of Paysign were required to, among other things:

a.     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

b.     conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c.     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

d.     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

e.     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

29.     Each of Defendants, as a director or officer, owed to the Company and its stockholders the fiduciary duties of loyalty, good faith, and candor in the management and

administration of the affairs of the Company, as well as in the use and preservation of its property and assets.   The conduct of Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its stockholders that Defendants were aware or should have been aware posed a risk of serious injury to the Company.

30.     The Company has established a Code of Business Conduct and Ethics (the "Code"), which all Company directors, officers, and employees are to comply with, states:

> 2. COMPLIANCE WITH LAWS AND REGULATIONS
>
> Employees must comply with all applicable laws and regulations which relate to their activities for and on behalf of Paysign. Paysign will not tolerate any violation of the law or unethical business dealing by any employee, including any payment for, or other participation in, an illegal act, such as bribery.
>
> Paysign is committed to full compliance with the laws and regulations of the cities, states and countries in which it operates. You must comply with all applicable laws, rules and regulations in performing your duties for Paysign. Numerous federal, state and local laws and regulations define and establish obligations with which Paysign, its employees and agents must comply. Under certain circumstances, local country law may establish requirements that differ from this code.
>
> You are expected to comply with all local country laws in conducting Paysign's business. If you violate these laws or regulations in performing your duties for Paysign, you not only risk individual indictment, prosecution and penalties, as well as civil actions and penalties, but also subject Paysign to the same risks and penalties. If you violate these laws in performing their duties for Paysign, you may be subject to immediate disciplinary action, including possible termination of your employment or affiliation with Paysign.
>
> Employees must ensure that their conduct cannot be interpreted as being in any way in contravention of applicable laws and regulations governing the operations of Paysign.
>
> *       *       *
>
> 3.2 Relationships with Clients, Customers and Suppliers
>
> Paysign recognizes that relationships with clients, customers and suppliers give rise to many potential situations where conflicts of interest, real or perceived, may arise. Employees should ensure that they are independent, and are seen to be independent, from any

business organization having a contractual relationship with Paysign or providing goods or services to Paysign, if such a relationship might influence or create the impression of influencing their decisions in the performance of their duties on behalf of Paysign. In such circumstances, employees should not invest in, or acquire a financial interest, directly or indirectly, in such an organization.

*       *       *

3.5 Insider Information and Insider Trading

Employees may receive information concerning Paysign or one of its affiliates, business partners, clients, or customers that is confidential and not generally known by the public. If that information is "material" (i.e., publication of that information is likely to affect the market price of the stock of the entity to which the information relates), then the employee has an ethical and legal obligation not to (a) act on that information (i.e., buy or sell stock based on that information), (b) disclose that information to others, or (c) advise others to buy or sell the stock of the entity to which that information relates, until such information becomes public. An employee's direct or indirect use of or sharing of such confidential, privileged, or otherwise proprietary business information of Paysign or its partners, clients, or customers for financial gain, including investment by the employee or the transmission of this information to others so that they can use this information for their financial gain, constitutes insider trading, which is a criminal offense. Please refer to Paysign's Insider Trading Policy for more information.

*       *       *

8. PAYSIGN'S RECORDS

Accurate and reliable records of many kinds are necessary to meet Paysign's legal and financial obligations and to manage the affairs of Paysign.  Paysign's books and records should reflect all business transactions in an accurate and timely manner. Undisclosed or unrecorded revenues, expenses, assets or liabilities are not permissible, and the employees responsible for accounting and record-keeping functions are expected to be diligent in enforcing proper practices.

31.     Defendants Henry, Mina, and Triplett were members of the Board's Audit Committee during the Relevant Period, and they were required to comply with the Audit Committee Charter that was in place at the time of the alleged wrongdoing. The Audit Committee Charter provides that the members of the Audit Committee "shall oversee the Company's accounting and financial reporting processes and the audit of the Company's financial statements," including, "a) [t]he quality and integrity of the Company's financial statements; b) [t]he Company's compliance with legal and

regulatory requirements; c) [t]he independent auditor's qualifications and independence; and d) [t]he performance of the Company's internal audit function and independent auditors." Moreover, the Audit Committee Charter provides, among other things:

A. The Committee shall:

1. Have the sole authority to appoint, retain, compensate, oversee, evaluate and, where appropriate, terminate the independent auditors who shall audit the financial statements of the Company.

2. Select, retain, compensate, oversee and terminate, if necessary, any other registered public accounting firm engaged by the Company for the purpose of preparing or issue an audit report or performing other audit, review or attest services for the Company.

3. Inform each registered public accounting firm performing audit or permissible non- audit services for the Company that such firm shall report directly to the Committee.

4. At the beginning of each new fiscal year, review and approve the proposed scope of the fiscal year's internal and external audit. At, or shortly after the end of each fiscal year, review with the independent auditor, the internal auditor, if any, and Company management, the audited financial statements and related opinion and costs of the audit of that year.

5. Review and pre-approve any audit and permitted non-audit services to be provided by the Company's independent auditors, and the compensation and fees to be paid to such independent auditors for such services, and establish policies and procedures for the Committee's pre-approval of permitted services by the Company's independent auditors. The Committee has the sole authority to make these approvals, although such approval may be delegated to any Committee member so long as the approval is presented to the full Committee at a later time.

6. Review, at least annually, the qualifications, performance and independence of the independent auditor. In conducting such review, the Committee shall obtain and review a report by the independent auditor describing: (1) the audit firm's internal quality-control procedures; (2) any material issues raised by the most recent internal quality-control review, or peer or PCAOB review of the firm, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, regarding one or more independent audits carried out by the firm, and any steps taken to deal with any such issues; and (3) to assess the auditor's independence, all relationships between the independent auditor and the Company. The independent auditors shall provide the Committee with a written statement describing all relationships between the auditors and the Company, and the Committee shall discuss with the independent auditors any disclosed relationships or

services that may impact the objectivity or the independence of the auditors.

7. Obtain and review, at least annually, a written report from the independent auditor describing (1) all critical accounting policies and practices; (2) all alternative treatments of financial information within generally accepted accounting principles ("GAAP") that have been discussed with Company management, the ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor; and (3) other material written communications between the independent auditors and Company management, such as any management letter or schedule of unadjusted differences.

8. Review and discuss with the independent auditors and management (1) any audit problems or other difficulties encountered by the auditor in the course of its audit work, including any restrictions on the scope of the independent auditor's activities or on access to requested information; (2) any significant disagreements with management; and (3) management's responses to such matters. The Committee shall oversee the resolution of any disagreements between management and the auditors regarding financial reporting.

9. Review, periodically, issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies; analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements; and the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company.

10. Review and discuss, at least annually, with the Company's independent auditors the matters required to be discussed by PCAOB Auditing Standards No. 16 -- Communications with Audit Committees and the Statement on Auditing Standards No. 61 (Codification of Statements on Auditing Standards, AU Sec. 380), as modified or supplemented.

11. Review with management, the independent auditors, and the internal auditors, if any, the adequacy and effectiveness of the Company's internal controls, and the integrity of the Company's financial reporting process.

12. Review, as applicable, funding and investment policies, implementation of funding policies and investment performance of the Company's benefit plans.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

13. Review and approve any recommendations, certifications and reports that may be required by NASDAQ or the SEC, including the report of the Committee that must be included in the Company's annual proxy statement.

14. Review disclosures made to the Committee by the Company's CEO and CFO about any significant deficiencies in the design and operation of internal controls or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Company's internal controls.

15. Review and discuss the annual audited financial statements and quarterly financial statements with management and the independent auditor, including the disclosures made in "Management's Discussion and Analysis of Financial Condition and Results of Operations," any major issues regarding accounting, disclosure and auditing procedures and practices, and the adequacy of internal controls that could materially affect the Company's financial statements. Based on such annual review, the Committee shall recommend to the Board the inclusion of the financial statements in the Company's annual report on Form 10-K.

16. Discuss with management the type of presentation and type of information to be included in the Company's earnings press releases and the financial information and earnings guidance provided to, as applicable, analysts and rating agencies.

17. Establish and oversee procedures for (1) the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters; and (2) the confidential anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

18. Ensure the regular rotation of the lead audit partner of the Company's independent auditors as required by the Exchange Act and the rules of the SEC, and consider regular rotation of the registered public accounting firm serving as the Company's independent auditors.

19. Confirm with any independent auditor retained to provide audit services for any fiscal year that the lead (or coordinating) audit partner having primary responsibility for the audit, or the audit partner responsible for reviewing the audit, has not performed audit services for the Company in each of the five previous fiscal years of the Company and that the firm meets all legal and professional requirements for independence.

20. Discuss with management, the independent auditors and the internal auditors, if any, the Company's policies to govern the process by which management assesses and manages the Company's risks, including the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

21. Endeavor to determine that auditing procedures and controls are adequate to safeguard Company assets and assess compliance with Company policies and legal requirements.

22. Review and discuss with the independent auditor the Company's internal audit function, if any, including its performance, responsibilities, staffing and budget.

23. Set clear Company hiring policies for employees or former employees of the independent auditors that participated in any capacity in any Company audit.

24. Discuss with management and the independent auditor any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding the Company's financial statements or accounting policies.

25. Review, approve and oversee any "related party transactions," as such term is defined in Item 404 of Regulation S-K under the Exchange Act, on an ongoing basis, and establish appropriate procedures to receive material information about, and prior notice of, any such transaction.

26. Review and evaluate, at least annually, the performance of the Committee and its members, including a review of the Committee's compliance with this Charter.

27. Review and reassess, at least annually, the adequacy of this Charter and recommend changes to the Board.

32.     Defendants Henry, Mina, Williams, and Triplett were members of the Board's Compensation Committee during the Relevant Period, and they were required to comply with the Compensation Committee Charter that was in place at the time of the alleged wrongdoing. The Compensation Charter provides that each director serving on the committee is responsible for "review[ing] and manag[ing] the compensation structure of the Company, administer stock incentive plans, and oversee[ing] and review[ing] various benefit plans of the Company. The Compensation Charter also provides, among other things, that the Compensation Committee shall:

A. Review and approve the factors and criteria, including corporate goals and objectives, applicable to the compensation of the Chief Executive Officer (the "CEO") and other executive officers.

B. Review and evaluate the performance of the CEO and other executive officers and other employees identified by the Committee as key employees of the Company ("Key Employees") in light of

the goals and objectives of the Company, including consideration of the Company's performance and relative stockholder return.

C. Determine and recommend for to the full board the annual compensation packages for the CEO, other executive officers, and Key Employees, including their base salaries, stock options and other stock-based incentives, variable pay amounts and variable pay metrics, based on the Committee's evaluations and, in accordance with the Company's incentive compensation plans, including the Company's stock option plan(s) as in effect from time to time. In evaluating and determining executive compensation, the Committee will consider the results of the most recent stockholder advisory vote on executive compensation. The CEO may not be present during voting or deliberations concerning his or her compensation.

D. Review and approve, or make recommendations to the Board regarding, incentive compensation plans and equity-based plans in which executive officers and directors are eligible to participate, as well as any amendments or modifications to such plans.

E. Supervise and oversee the administration of the Company's incentive compensation and equity-based plans, variable pay and stock programs, and approve equity grants under the Company's stock option and stock incentive plans.

F. Review and act upon management proposals to (i) designate Key Employees to incentive compensation programs; and (ii) approve new benefit plans.

G. Monitor the effectiveness of benefit plan offerings and approve changes where appropriate.

 H. Review, and make recommendations to the Board regarding, any employment agreements and any severance arrangements, including any benefits to be provided in connection with a change of control, for the CEO and other executive officers, as well as any amendments or modifications to such agreements or arrangements.

I. Review, evaluate and manage the potential risks posed to the Company by its incentive compensation arrangements and compensation program and policies.

J. Develop and recommend to the Board the annual retainer fee as well as other compensation for the non-employee directors.

K. Prepare and approve the Committee report to be included as part of the Company's annual proxy statement and Annual Report on Form 10-K.

L. Oversee the Company's submissions to shareholders on executive compensation matters, including advisory votes on executive compensation and the frequency of such votes, and assess the results of the Company's most recent advisory vote on executive compensation.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

M. Review and evaluate, at least annually, the performance of the Committee and its members, including a review of the Committee's compliance with this Charter.

N. Review and reassess, at least annually, the adequacy of this Charter and recommend changes to the Board.

33. Defendants Henry and Williams were members of the Board's Nominating Company, and they were  comply with the Nominating Committee Charger, which required the members to "(1) identify individuals qualified to become members of the Board and  recommend director candidates to the Board for election or re-election; and (2) develop, recommend to the Board, and  review the Company's corporate governance policies and practices, taking in consideration the rules of The NASDAQ Stock Market LLC ("NASDAQ"), the Securities and Exchange Commission ("SEC"), as well as other applicable laws, rules and regulations." Further, the Nominating Committee was responsible for, among others, the following:

A. Identify, evaluate and recommend to the Board, consistent with criteria approved by the Board, nominees for election as directors at each annual meeting of stockholders of the Company, and as otherwise required, whose experience and expertise will provide added value to the Board's oversight responsibilities.

B. Develop, and recommend to the Board for its approval, criteria to be considered in selecting director nominees, including matters related to professional skills and experience, board composition, and potential conflicts of interest.

C. Establish procedures for consideration of candidates for recommendation to the Board, including candidates put forward by stockholders, and consider individuals whose names are submitted by management or by stockholders as candidates for election to the Board.

D. Coordinate and oversee meetings and other actions requiring the consideration of the non-employee directors of the Board.

E. Develop and recommend to the Board a set of corporate governance principles applicable to the Company, review these principles periodically and recommend any changes to the Board.

F. Periodically review and recommend to the Board changes to the Company's Code of Conduct and Ethics (the "Code"), and monitor overall compliance with the Code.

G. Review all potential conflicts of interest under and violations of the Company's Code of Conduct and Ethics (the "Code"), and

consider all waivers of compliance with the Code, and make recommendations to the Board regarding whether to grant a waiver of compliance with the Code.

34.     Additionally, as executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the Nasdaq, the Individual Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including false and misleading information about acquisitions, so that the market price of the Company's common stock would be based upon truthful and accurate information.  Accordingly, the Individual Defendants breached their fiduciary duties by knowingly or recklessly causing Paysign to make false and misleading statements of material fact about the Company's financials and about Paysign's maintenance of adequate internal controls.

35.     Each of the Individual Defendants further owed to Paysign and its stockholders the duty of loyalty requiring that each favor Paysign's interest and that of its stockholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

## ADDITIONAL SUBSTANTIVE ALLEGATIONS

### *Company Background*

36.     Paysign is a card payment solutions provider and an integrated payment processor founded in 2001 by Newcomer and Spence. The Company was previously known as 3PEA, and adopted its current name on April 23, 2019 and changed its NASDAQ trading symbol to "PAYS."

37.     Paysign provides a card processing platform, through which the Company provides a variety of services including transaction, processing, cardholder enrollment, value loading, cardholder account management, reporting, and customer service.

38.     Paysign also developed prepaid card programs for corporate incentive and rewards including, but not limited to, consumer rebates and rewards, donor compensation, clinical trials, healthcare reimbursement payments and pharmaceutical payment assistance.

39.     The Company generates significant of its revenue from the plasma donation industry and the pharmaceutical industry. In 2011, the Company began marketing a corporate incentive prepaid card-based payment solution targeting the plasma donation industry. Since then, the Company expanded its efforts on disbursement programs, corporate incentive and expense card programs, as well as targeting the pharmaceutical industry with co-pay assistance, buy and bill, and other prepaid programs designed to assist patient enrollment. In 2019, nearly 78% of the Company's revenues derived from the plasma industry. Also, in 2019, nearly 20% of the Company's revenues derived from the pharmaceutical industry.

40.     Over the years, Paysign has had problems associated with its accounting practices and its auditors. Prior to 2008, De Joya & Company served as the Company's auditor. De Joya & Company, which was run by Joya, who served as the Company's Chief Financial Officer ("CFO") from 2007 to 2015. Joya was prohibited from appearing or practicing before SEC as an accountant for three years in 2015 for willful violation of Section 17(a) of the Securities Act of 1933 (the "Securities Act") in connection with a fraud scheme perpetrated by a Canadian stock promoter related to 20 purported mining companies. Joya, according to the SEC, ignored red flags alerting him to the fact that Jonathan Briner ("Briner"), an attorney prohibited form practicing before the SEC, had been involved in dozens of fraud schemes that resulted in millions of dollars lost by thousands of investors. Joya, through one of his accounting firms, continued to provide services to Briner. Despite all these problems, the Company hired Joya to serve as its CFO.

41.     After De Joya & Company resigned as the Company's auditor, Sarna & Company ("Sarna"), a three person firm, served as the Company's auditor until 2017. In February 2017, the Public Company Accounting Oversight Board ("PCAOB") published a scathing report regarding Sarna's audits of the Company's financial statements, concluding that Sarna issued an opinion "without satisfying its fundamental obligation to obtain reasonable assurance about whether the financial statements were free of material misrepresentations." Specifically, the PCAOB identified the "failure to perform sufficient procedures to test revenue recognition" as the audit deficiency that did not provide reasonable assurance that the Company's financial statements did not contain

material misrepresentations. Id. The PCAOB further concluded that Sarna's failure to sufficiently test revenue recognition procedures was attributable to a lack of "due professional care."

42.     After Sarna resigned as the Company's auditor in April 2017, Squar Milner LLP was hired as the Company's auditor. Thereafter, Squar Milner LLP purportedly audited the Company's materially false and misleading financial statements included in the Annual Report on Form 10-K filed with the SEC for the year that ended on December 31, 2018 ("2018 10-K"). Interestingly, Squar Milner LLP also audited the financial statements of Pareteum Corporation, a company associated with insiders repeatedly accused of stock promotion schemes and other misconduct, which was also accused of accounting fraud in the summer of 2019 and has admitted that its financial statements cannot be relied upon by investors.

43.     On July 2, 2020, Paysign announced that it dismissed Squar Milner LLP and appointed BDO USA, LLP as the Company's new public accounting firm. In addition, the Company admitted that its 2018 10-K, the Annual Report contained numerous false statements.

### *The Individual Defendants Cause the Company to Issue False and Misleading Statements*

44.     Unbeknownst to investors, during the Relevant Period, the Individual Defendants caused the Company to issue materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, among others, that: (1) the Company failed to design, implement, and maintain effective IT general controls, specifically pertaining to user access and the Company's systems change management; (2) the Company failed to maintain effective disclosure controls and internal controls over its financial reporting; and (3) due to the foregoing, the Company would be forced to delay filing its 2019 10-K and holding its 2019 year-end earnings call.

45.     On March 12, 2019, the Individual Defendants caused the Company to file a Form 10-K with the SEC, which was signed by defendants Newcomer, Attinger, and Spence. The Form 10-K stated, in relevant part:

We depend on key personnel and could be harmed by the loss of their services because of the limited number of qualified people in our industry.

Because of our small size, we require the continued service and performance of our management team, sales and technology employees, all of whom we consider to be key employees. Competition for highly qualified employees in the financial services and healthcare industry is intense. Our success will depend to a significant degree upon our ability to attract, train and retain highly skilled directors, officers, management, business, financial, legal, marketing, sales, and technical personnel and upon the continued contributions of such people. In addition, we may not be able to retain our current key employees. The loss of the services of one or more of our key personnel and our failure to attract additional highly qualified personnel could impair our ability to expand our operations and provide service to our customers.

*       *       *

We Incur Significant Costs As A Result Of Operating As A Public Company. We May Not Have Sufficient Personnel For Our Financial Reporting Responsibilities, Which May Result In The Untimely Close Of Our Books And Record And Delays In The Preparation Of Financial Statements And Related Disclosures.

As a registered public company, we have experienced an increase in legal, accounting and other expenses. In addition, the Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act"), as well as new rules subsequently implemented by the SEC, has imposed various requirements on public companies, including requiring changes in corporate governance practices. Our management and other personnel need to devote a substantial amount of time to these compliance initiatives. Moreover, these rules and regulations have increased our legal and financial compliance costs and make some activities more time-consuming and costly. If we are not able to comply with the requirements of Sarbanes-Oxley Act, or if we or our independent registered public accounting firm identifies additional deficiencies in our internal control over financial reporting that are deemed to be material weaknesses, the market price of our stock could decline and we could be subject to sanctions or investigations by the SEC and other regulatory authorities.

*       *       *

Our business is dependent on the efficient and uninterrupted operation of computer network systems and data centers.

Our ability to provide reliable service to our clients and cardholders depends on the efficient and uninterrupted operation of our computer network systems and data centers as well as those of our third party service providers. Our business involves movement of large sums of money, processing of large numbers of transactions and management of the data necessary to do both. Our success

19

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

depends upon the efficient and error-free handling of the money. We rely on the ability of our employees, systems and processes and those of the banks that issue our cards, our third party service providers to process and facilitate these transactions in an efficient, uninterrupted and error-free manner.

*        *        *

In the event of a breakdown, a catastrophic event (such as fire, natural disaster, power loss, telecommunications failure or physical break-in), a security breach or malicious attack, an improper operation or any other event impacting our systems or processes, or those of our vendors, or an improper action by our employees, agents or third-party vendors, we could suffer financial loss, loss of customers, regulatory sanctions and damage to our reputation. The measures we have taken, including the implementation of disaster recovery plans and redundant computer systems, may not be successful, and we may experience other problems unrelated to system failures. We may also experience software defects, development delays and installation difficulties, any of which could harm our business and reputation and expose us to potential liability and increased operating expenses. We currently do not carry business interruption insurance.

*        *        *

Our chief executive officer and chief financial officer evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934) as of December 31, 2018. Based on that evaluation, our chief executive officer and chief financial officer concluded that, as of the evaluation date, such controls and procedures were effective.

*        *        *

As of December 31, 2018 we conducted an evaluation, under the supervision and with the participation of our chief executive officer (our principal executive officer), our chief operating officer and our chief financial officer (also our principal financial and accounting officer) of the effectiveness of our internal control over financial reporting based on criteria established in Internal Control - Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission, or the COSO Framework. Management's assessment included an evaluation of the design of our internal control over financial reporting and testing of the operational effectiveness of those controls.

A material weakness is defined within the Public Company Accounting Oversight Board's Auditing Standard No. 5 as a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. Based

upon this assessment, management concluded that our internal control over financial reporting was effective as of December 31, 2018.

46. The above statements in the 10-K were misleading when made because: (1) the Company employed an accountant prohibited from practicing before the SEC to assist in the preparation of the Company's financial statements for 2017, 2018 and 2019 filed with the SEC, and as a result the Company's "success" based on the retention of "highly skilled" personnel in finance was already impaired at the time these statements were made; (2) a material weakness in the Company's information technology general controls existed at that time.

47. On May 8, 2019, the Individual Defendants caused the Company to file a Form 10-Q with the SEC, which stated, in relevant part:

> Our chief executive officer and chief financial officer are responsible for establishing and maintaining our disclosure controls and procedures. Disclosure controls and procedures means controls and other procedures that are designed to ensure that information we are required to disclose in the reports that we file or submit under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms, and to ensure that information required to be disclosed by us in those reports is accumulated and communicated to the our management, including our principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure. Our chief executive officer and chief financial officer evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934) as of March 31, 2019. Based on that evaluation, our chief executive officer and chief financial officer have concluded that, as of the evaluation date, such controls and procedures were effective.

48. The above statement in the Form 10-Q was misleading because: (1) the Company employed an accountant prohibited from practicing before the SEC to assist in the preparation of the Company's financial statements for 2017, 2018 and 2019 filed with the SEC, and as a result the Company's "success" based on the retention of "highly skilled" personnel in finance was already impaired at the time these statements were made; (2) a material weakness in the Company's information technology general controls existed at that time.

49.     Defendants Newcomer and Attinger also attached their signed certifications to the Form 10-Q stating that they "[d]esigned such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under [their] supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared."

50.     On August 7, 2019, the Individual Defendants caused the Company to file a Form 10-Q, which repeated the effectiveness of the Company's internal controls over financial reporting stated in the Form 10-Q filed on March 8, 2019:

> Our chief executive officer and chief financial officer are responsible for establishing and maintaining our disclosure controls and procedures. Disclosure controls and procedures means controls and other procedures that are designed to ensure that information we are required to disclose in the reports that we file or submit under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms, and to ensure that information required to be disclosed by us in those reports is accumulated and communicated to the our management, including our principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure. Our chief executive officer and chief financial officer evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934) as of June 30, 2019. Based on that evaluation, our chief executive officer and chief financial officer have concluded that, as of the evaluation date, such controls and procedures were effective.

51.     The above statement in the Form 10-Q was misleading because: (1) the Company employed an accountant prohibited from practicing before the SEC to assist in the preparation of the Company's financial statements for 2017, 2018 and 2019 filed with the SEC, and as a result the Company's "success" based on the retention of "highly skilled" personnel in finance was already impaired at the time these statements were made; (2) a material weakness in the Company's information technology general controls existed at that time.

52.     Defendants Newcomer and Attinger also attached their signed certifications to the Form 10-Q stating that they "[d]esigned such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under [their] supervision, to ensure that material

information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared."

53.    On November 6, 2019, the Individual Defendants caused the Company to file a Form 10-Q with the SEC, which contained virtually identical disclosures regarding the Company's internal controls included in the Forms 10-Q filed on March 8, 2019 and August 7, 2019:

> Our chief executive officer and chief financial officer are responsible for establishing and maintaining our disclosure controls and procedures. Disclosure controls and procedures means controls and other procedures that are designed to ensure that information we are required to disclose in the reports that we file or submit under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms, and to ensure that information required to be disclosed by us in those reports is accumulated and communicated to the our management, including our principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure. Our chief executive officer and chief financial officer evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934) as of September 30, 2019. Based on that evaluation, our chief executive officer and chief financial officer have concluded that, as of the evaluation date, such controls and procedures were effective.

54.    The above statement in the Form 10-Q was misleading because: (1) the Company employed an accountant prohibited from practicing before the SEC to assist in the preparation of the Company's financial statements for 2017, 2018, and 2019 filed with the SEC, and as a result the Company's "success" based on the retention of "highly skilled" personnel in finance was already impaired at the time these statements were made; (2) a material weakness in the Company's information technology general controls existed at that time.

55.    Defendants Newcomer and Attinger also attached their signed certifications to the Form 10-Q stating that they "[d]esigned such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under [their] supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared."

***The Truth Begins to Emerge***

56.     On March 16, 2020, the Company announced that it would be unable to file its annual report on Form 10-K on time, in a press release titled "Paysign, Inc. Announces Preliminary Full-Year 2019 Financial Highlights and Delay of Form 10-K Filing." In the press release, Paysign disclosed that

> it will be delayed in the filing of its Annual Report on Form 10-K for the fiscal year ended December 31, 2019. Paysign is filing a Form 12b-25, Notification of Late Filing, with the Securities and Exchange Commission, which will provide Paysign with a 15 calendar-day extension beyond the March 16, 2020 deadline within which to file the annual report on Form 10-K. The filing extension will provide the necessary time to complete the financial audit.

>                     *          *          *

> Separately, in the course of completing its assessment of internal controls over financial reporting for 2019 and the company's initial year of compliance with Sarbanes-Oxley 404b, management identified material weaknesses related to (i) assessment of internal controls over financial reporting and (ii) information technology general controls.

57.     After this disclosure, the Company's stock price declined by nearly 15% from its previous day closing price of $5.52 per share to close at $4.59 per share on March 16, 2020. The price of Paysign's common stock declined again to close at $4.42 per share on March 17, 2020, and $4.06 per share on March 18, 2020. In total, the above disclosures resulted in wiping out the Company's market capitalization by more than $75 million.

58.     On March 31, 2020, Paysign announced that it required to delay filing the annual report once more by publishing a press release titled "Paysign, Inc. to Delay Yearend Earnings Call Until March 31, 2020." The press release stated, "Paysign, Inc. (NASDAQ: PAYS), a vertically integrated provider of innovative prepaid card programs, digital banking and processing services for corporate, consumer and government applications, today announced that it will delay its yearend conference call, previously scheduled for March 25th 2020 until March 31, 2020 at 5:00 PM Eastern Time. The Company's financial results are scheduled to be released shortly after the market closes that day."

59.    Following this disclosure, the Company's stock price declined by over 22% from its previous day closing price of $5.16 to close at $4.35 per share on April 1, 2020. The price of Paysign's common stock declined again on April 2, 2020 to close at $4.03 per share.

60.    On April 3, 2020, the Company finally filed an annual report on Form 10-K with the SEC, which disclosed, in relevant part:

> Inadequate and ineffective management assessment of internal control over financial reporting, and ineffective design, implementation and monitoring of information technology general controls pertaining to privileged user accounts and the Company's change management to financial applications. Additionally, the Company lacked sufficient monitoring and disclosure controls to prevent and terminate the employment of an individual barred from practicing before the Securities and Exchange Commission who assisted the Company in accounting matters related to the preparation of its financial statements for 2017, 2018 and 2019.

*      *      *

> [M]anagement concluded that our internal control over financial reporting was not effective. Material weaknesses included the management assessment of internal control over financial reporting, and ineffective oversight of information technology general controls pertaining to user access and the Company's systems change management. During quarter 4 of 2019 and continuing in 2020, management has taken steps to i) improve the design and methods for testing internal controls, ii) added resources to carry out such practices, and iii) instituted new procedures for managing system user access and change control. Additionally, a third material weakness cited by the auditors was that the Company lacked sufficient monitoring and disclosure controls when employing a part-time employee. The Company believes that it had sufficient monitoring and disclosure controls in place and received an opinion of counsel concluding that such work did not constitute a compliance failure. In any event, this situation has already been resolved by the individual no longer being employed by the Company.

61.    Three days later, on April 6, 2020, the Company held a conference call with investors and analysts to discuss the financial and operational results for the fiscal year that ended on December 31, 2019. During the call, Newcomer explained that the delay in filing the annual report was due to "several rounds of auditor request[s] for additional data, which took several days to complete." Attinger also added that Paysign and its auditors identified material weaknesses in its internal controls over financial reporting, including a lack of appropriate separation of

responsibilities, inadequate documentation and additional deficiencies related to "systems user access and change control."

### *The Individual Defendants' Stock Sales during the Relevant Period*

62.   During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendants Newcomer, Spence, Henry, and Williams (collectively, the "Insider Selling Defendants") made the following sale of Paysign stock, taking advantage of Paysign's artificially inflated stock price:

| Defendant | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| Newcomer | 4/18/2019 | 35,000 | $8.43 | $295,050 |
| Newcomer | 9/16/2019 | 200,000 | $11.03 | $2,206,000 |
| Henry | 9/18/2019 | 2,572 | $11.21 | $28,832 |
| Henry | 9/23/2019 | 14,308 | $11.01 | $157,531 |
| Spence | 9/23/2019 | 20,681 | $11.01 | $227,697 |
| Henry | 9/24/2019 | 1,100 | $11.03 | $12,133 |
| Spence | 9/24/2019 | 3,100 | $11.02 | $226,698 |
| Spence | 10/2/2019 | 1,600 | $11.00 | $17,600 |
| Henry | 10/2/2019 | 1,800 | $11.00 | $19,800 |
| Spence | 10/3/2019 | 49,981 | $11.02 | $550,790 |
| Henry | 10/3/2019 | 31,674 | $11.02 | $349,047 |
| Spence | 10/4/2019 | 44,638 | $11.40 | $508,873 |
| Henry | 10/4/2019 | 98,546 | $11.53 | $1,136,235 |
| Williams | 10/28/2019 | 15,000 | $10.94 | $164,100 |

63.   The stock sales above were dramatically out of line with the Insider Selling Defendants' prior trading activity before the Relevant Period in terms of both total number of shares sold and the amount of proceeds reaped from any sale of Paysign's artificially inflated stock price.

### **DAMAGES TO THE COMPANY**

64.     As a result of Defendants' wrongful conduct, Paysign disseminated false and misleading statements and omitted material information to make such statements false and misleading when made.  The improper statements have devastated Paysign's credibility.  Paysign has been, and will continue to be, severely damaged and injured by Defendants' misconduct.

65.     As a result of Defendants' misconduct, Paysign has sustained damages, including, but not limited to:  (1) costs and expenses incurred from having to defend and possibly settle the Securities Class Action; and (2) costs and expenses incurred from the Company having to remedy its inadequate internal controls, including engaging a national accounting advisory firm to assist with the design and implementation of its internal controls over financial reporting.

66.     Moreover, these actions have irreparably damaged Paysign's corporate image, reputation, and goodwill.  For the foreseeable future, Paysign will suffer from what is called a "liar's discount," a term applied to the stocks of companies that have been implicated in illegal behavior and have misled the investing public such that future efforts to raise capital (through equity or debt) will be substantially hindered.

## DERIVATIVE AND DEMAND REFUSED ALLEGATIONS

67.     Plaintiff brings this action derivatively for the benefit of the Company to redress injuries suffered and to be suffered as a proximate result of Defendants' breaches of fiduciary duties and unjust enrichment.

68.     Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

69.     Plaintiff is an owner of Paysign common stock and was an owner of Paysign common stock at all times relevant hereto.

70.     On May 28, 2021, Plaintiff sent the Demand to the Board to investigate and take action to pursue claims against those responsible for causing the Company's material weaknesses in its internal controls, which resulted in the Company facing immense liability, as well as costs in connection with defending against the Securities Class Action. A true and correct copy of the Demand is attached hereto as Exhibit A.

71.   On June 10, 2021, Plaintiff received a letter from Paysign's General Counsel stating that the Demand "will be considered by Paysign's Board of Directors." A true and correct copy of Paysign's response to the Demand is attached hereto as Exhibit B.

72.   On May 16, 2022, Plaintiff requested an update on the Board's review of the Demand, and advised Paysign's General Counsel. A true and correct copy of Plaintiff's follow-up letter to the Demand is attached hereto as Exhibit C.

73.   On June 9, 2022, Paysign's General Counsel responded to Plaintiff's May 16, 2022 follow-up letter that "[t]he Board will deal with the issues addressed in the derivative cases as it deems appropriate, including a review of any decision rendered in the Securities Class Action." A true and correct copy of Paysign's response is attached hereto as Exhibit D.

74.   Later that day, Plaintiff sought to clarify the Board's review of the Demand, whether the Board had not taken any action with respect to the Demand, and requested that the Company take any steps necessary to secure tolling agreements from any potential defendant in any litigation that might result from the Demand. A true and correct copy of Plaintiff's June 9, 2022 letter is attached hereto as Exhibit E.

75.   On July 5, 2022, Plaintiff followed-up with Paysign in an e-mail as to his request that Company take necessary steps to secure tolling agreements. A true and correct copy of Plaintiff's July 5, 2022 e-mail is attached hereto as Exhibit F.

76.   On July 20, 2022, Paysign's General Counsel responded to the June 9, 2022 letter and the July 5, 2022 e-mail, declining Plaintiff's request to secure any tolling agreements, indicating that any existing cases were sufficient to protect Plaintiff's interest. A true and correct copy of Paysign's July 20, 2022 letter is attached hereto as Exhibit G.

77.   On February 9, 2023, United States District Judge Gloria M. Navarro granted in part and denied in part the defendants' motion to dismiss the Securities Class Action. Specifically, judge Navarro sustained claims against Paysign, Newcomer, and Attinger under the Exchange Act.

78.   Given the material developments in the Securities Class Action, on April 17, 2023, Plaintiff sent a letter to Paysign referencing judge Navarro's decision, and requested any updates as

to the Board's review of the Demand. A true and correct copy of Plaintiff's April 17, 2023 letter is attached hereto as Exhibit H.

79.    On June 21, 2023, having not received any response from Paysign, Plaintiff sent a follow-up letter to Paysign's General Counsel, reminding that the Board must act promptly upon receiving a litigation demand. Plaintiff also requested information as to whether the Board has formed a committee to investigate the issues raised in the Demand and what steps that the Board has taken as to the Demand. Plaintiff also informed that the Demand will be deemed refused if no response, or an incomplete response, was provided. A true and correct copy of Plaintiff's June 21, 2023 letter is attached hereto as Exhibit I.

80.    On June 28, 2023, Paysign's General Counsel responded, again implicating that the Board had taken no concrete steps in furtherance of Plaintiff's Demand. Among other things, Paysign indicated that no special committee had been formed to take up the issues raised in the Demand. Nor had the Company taken any steps to secure tolling agreements from any parties deemed potentially responsible for the misconduct at issue. A true and correct copy of Paysign's June 28, 2023 letter is attached hereto as Exhibit J.

81.    Paysign's lack of meaningful response to the Demand and Plaintiff's numerous follow-up requests amounts to a constructive refusal of the Demand.

82.    The Board has taken no steps to investigate, much less prosecute, the wrongdoing at issue.

83.    The Board has not formed a special litigation committee to investigate, much less prosecute, the wrongdoing at issue.

84.    The Board has not addressed the misconduct through other means, such as through the termination or suspension of culpable individuals, clawing back executive or director compensation awards for periods when the wrongdoing occurred, or prospectively amending compensation packages to reduce compensation.

85.    The Board's (or the Company's) failure to obtain tolling agreements also reflects the deliberate refusal to safeguard the Company's interests. Although Paysign's General Counsel seems

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

to think that existing derivative litigation may be adequate to protect the Company's interests, such a conclusion does not reflect any Board determination whatsoever. Plaintiff's Demand was addressed to the Board, and the Board's inaction in this regard is inexcusable. Moreover, the notion that existing litigation may be adequate to protect the Company's interests ignores two basic things: *First*, existing derivative litigation does not name all the culpable parties (including, for example, Joya) and thus could not suffice to protect Paysign's interests. *Second*, the dismissal, voluntary or involuntary, of existing litigation could nullify the tolling effect of such litigation.

86.     As the foregoing demonstrates, the Board's inaction in response to the Demand is unreasonable. The Board's failure to take reasonable action in response to the Demand constitutes a de facto refusal of the Demand. The Board's rejection of the Demand was not an objective decision reached with due care, as the Board did not act reasonably or in good faith, on the basis of all reasonably available information. Rather, the Board summarily disregarded the merits of the claims and allegations. In light of the substantial amount of time that has passed, the Board's apparent willingness to let valuable claims expire, and the Board's refusal to fulfill its fiduciary duty to advance the meritorious claims set forth in Plaintiff's Demand, Plaintiff now brings this Action.

## COUNT I

### Against Defendants for Breach of Fiduciary Duty

87.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

88.     Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, Defendants owed and owe the Company the highest obligations of good faith, fair dealing, loyalty, and due care.

89.     Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty.  More specifically, Defendants violated their duty of good faith by knowingly causing or recklessly allowing the Company to make false and misleading statements or fail to disclose that: (1) the Company failed to design, implement, and maintain effective IT general controls, specifically pertaining to user access and the Company's systems change management; (2)

the Company failed to maintain effective disclosure controls and internal controls over its financial reporting; and (3) due to the foregoing, the Company would be forced to delay filing its 2019 10-K and holding its 2019 year-end earnings call. Moreover, Defendants willfully ignored the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

90.     As a direct and proximate result of Defendants' breaches of their fiduciary obligations, Paysign has sustained significant damages, as alleged herein.   As a result of the misconduct alleged herein, these defendants are liable to the Company.

91.     Plaintiffs, on behalf of Paysign, have no adequate remedy at law.

## COUNT II

### Against Defendants for Breach of Fiduciary Duty for Wrongful Refusal

92.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

93.     As directors of the Company, each Defendant owed the Company and its stockholders the fiduciary obligations of loyalty, good faith, and fair dealing.

94.     The Defendants' lack of meaningful response to the Demand and Plaintiff's numerous follow-up requests amounts to a constructive refusal of the Demand.

95.     The Defendants breached their fiduciary duties by refusing to correct the situation upon being provided with an opportunity to do so through the Demand. The Defendants' refusal of the Demand was unreasonable and in bad faith.

96.     As a result of Defendants' actions, the Company has been and will be damaged.

97.     Plaintiff and the Company have no adequate remedy at law.

## COUNT III

### Against Defendants for Unjust Enrichment

98.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

99.     By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of Paysign in the form of salaries, bonuses, and other forms of compensation.

100.     Plaintiff, as a stockholder and representative of Paysign, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

101.     Additionally, at the time each of the Insider Selling Defendants sold his or her Paysign stock, he or she knew the material, non-public information described above, and sold Paysign stock on the basis of such information.

102.     The information described above was proprietary, non-public information concerning the Company's business operations, financial condition, and growth prospects.  It was a proprietary asset belonging to the Company, which each of the Insider Selling Defendants misappropriated to his or her own benefit when he or she sold personal holdings in Paysign stock.  Each of the Insider Selling Defendants knew that this information was not intended to be available to the public.  Had such information been generally available to the public, it would have significantly reduced the market price of Paysign stock.

103.     The Insider Selling Defendants' sale of stock while in possession and control of this material, adverse, non-public information was a breach of his or her fiduciary duties of loyalty and good faith.  Each of the Insider Selling Defendants is therefore liable to Paysign for insider trading.

104.     Since the use of the Company's proprietary information for personal gain constituted a breach of the fiduciary duties of the Insider Selling Defendants, the Company is entitled to the imposition of a constructive trust on any profits such Insider Selling Defendants obtained thereby.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of Paysign, demands judgment as follows:

A.      Declaring that Plaintiff may maintain this derivative action on behalf of Paysign and that Plaintiff is a proper and adequate representative of the Company;

B.      Awarding the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties and other violations of law;

C.      Ordering the Insider Selling Defendants to disgorge the profits obtained as a result of their sale of Paysign stock while in possession of insider information as described herein;

D.      Granting appropriate equitable relief to remedy Defendants' breaches of fiduciary duties and other violations of law;

E.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury.

DATED:  December 26, 2023                    Respectfully submitted,


                                             */s/ Martin A. Muckleroy*
                                             **MUCKLEROY LUNT, LLC**
                                             MARTIN A. MUCKLEROY
                                             Nevada Bar No.: 009634
                                             6077 S. Fort Apache Rd., Ste. 140
                                             Las Vegas, NV 89148
                                             Phone: (702) 907-0097
                                             Fax: (702) 938-4065
                                             martin@muckleroylunt.com

                                             *Liaison Counsel for Plaintiff*

                                             **JULIE & HOLLEMAN LLP**
                                             W. Scott Holleman
                                             157 East 86th Street, 4th Floor
                                             New York, NY 10028
                                             Telephone: (929) 415-1020
                                             *Counsel for Plaintiff*

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT